# URSULA BOCCHI v. CAL B. KARNSTEDT AND ANOTHER. HUBERT J. BARTLETT, RESPONDENT.[1]

January 9, 1953.

Nos. 35,702, 35,836.

[1]Reported in 56 N. W. (2d) 628.

258

*Freeman, King, Larson & Peterson* and *Harry H. Peterson,* for appellant.

*William H. DeParcq* and *Donald T. Barbeau,* for respondent Bocchi.

*Faegre & Benson, Paul J. McGough,* and *Wright W. Brooks,* for respondent Bartlett.

MAGNEY, JUSTICE.

On February 5, 1950, at about 8 p. m., plaintiff was a guest passenger in an automobile owned and operated by defendant Hubert J. Bartlett. At the intersection of France avenue and West 39th street in Minneapolis and St. Louis Park, the boundary between the municipalities being the center line of France avenue, a collision took place between the automobile of defendant Bartlett and an automobile owned and operated by defendant Cal B. Karnstedt. Plaintiff was seriously injured. She brought an action against both automobile owners and recovered a verdict against them. Defendant Bartlett made an alternative motion for judgment notwithstanding the verdict or for a new trial, and defendant Karnstedt moved for a new trial. The court granted defendant Bartlett's motion for judgment notwithstanding the verdict and denied defendant Karnstedt's motion. Judgment was entered in favor of the plaintiff against defendant Karnstedt, and he appeals to this court from the orders granting defendant Bartlett's motion for judgment notwithstanding the verdict and denying his own motion for a new trial and also from the judgment.

Defendant Bartlett's car was a two-door Chevrolet. Plaintiff, Ursula Bocchi, was seated on the right-hand side of the front seat. A Mrs. Blanche Lenont was seated between plaintiff and Bartlett.

Mrs. Bartlett and a son, James, were in the rear seat, the former on the right-hand side. Bartlett was driving southerly on France avenue. He had on the city driving lights. Bartlett was well acquainted with France avenue and knew that it was a through or arterial highway, protected on each side by stop signs. France avenue, between West 38th and West 39th street, has a five-percent downgrade. That block is approximately 585 feet long. France avenue is 36 feet wide, and West 39th street is 32 feet wide. Bartlett testified that he came down from 38th street at a speed of 20 to 25 miles an hour until near the intersection of 39th street. He looked for traffic on 39th street and saw none coming from the east. When about 100 to 125 feet from the intersection, he saw a car coming from the west. Both cars were at that time about the same distance from the intersection and traveling at about the same speed. Bartlett said that he continued on his way because he knew that France avenue was a through street and that the oncoming car from the west would be required to come to a full stop. He further stated that, when he reached the point where a crosswalk would be if one existed, he realized the other car was not going to stop, so he applied his brakes and turned to the left to avoid the collision. The other car did not change its speed and was still going 20 to 25 miles an hour. The right front of Bartlett's car collided with the left front side of the Karnstedt car, the two sides came together, and the Bartlett car spun like a top. When it stopped it was headed in a northerly direction but not on the main traveled portion of either street. Debris from the collision was found about a foot over on the west side of France avenue and a little to the south of the center line of 39th street. When Bartlett's car came to rest, the left front was 33 feet and six inches from the debris. Karnstedt's car was then 62 feet from the debris. Both cars were southeast of the intersection. The Karnstedt car stopped in a swamp, having gone over the curb, through quite a bit of snow, and through a fence.

Sixty-seven feet west from the intersection on 39th street one is able to see the headlights of cars coming down France avenue from

as far up as 38th street. Bert Cole, Karnstedt's passenger, testified: "Well, we approached France Avenue about 20 miles an hour, and stopped at the stop sign adjacent to it, and I looked to the right and up to the left I could see a car some distance, and then Mr. Karnstedt proceeded through the intersection." Cole was then asked: "What place in the block was it when you picked up sight of it?" He answered, "Well, I would say approximately 150 to 175 feet." He said that the Karnstedt car was then in a stopped position at the stop sign, that he saw the Bartlett car travel 50 to 75 feet altogether at a rate of 40 miles per hour, and that he noticed slackening of the speed of the Bartlett car about 20 feet away "approximately." It had started to swerve then. On cross-examination, he said that, when he saw the Bartlett car the second time, it was a foot or two away from the Karnstedt car. Karnstedt testified that he did not know at what speed Bartlett was coming down France avenue. After the accident, plaintiff was found underneath the Bartlett car between the front and rear wheels on the right-hand side. The car was tipped over on its left side to get her out. She was severely injured and unconscious.

Police officers, who arrived at the scene shortly after the accident, testified that there was a strong odor of alcohol on Karnstedt's breath. About an hour and a half afterward they spoke to him at the hospital and the odor of alcohol was still present. Karnstedt and his passenger, Bert Cole, had been ice fishing at Lake Minnetonka that afternoon and said that on their way home they had stopped at a friend's house and had a couple of drinks.

Under the testimony, defendant Karnstedt was aware of the stop sign and chose to ignore it. As we said in Olson v. Anderson, 224 Minn. 216, 218, 28 N. W. (2d) 66, 68:

"* * * By doing so, he violated his duty to stop, look for, and yield the right of way to cars within the zone where they constituted an immediate hazard."

▪ Plaintiff has not challenged the correctness of the trial court's ruling in granting defendant Bartlett judgment notwithstanding

the verdict. Defendant Karnstedt contends that he was prejudiced by such ruling and assigns it as error. Bartlett claims that the appeal should be dismissed as to him for two reasons: (1) that defendant Karnstedt did not raise the question in the court below and is attempting to raise it for the first time on the appeal, and (2) that defendant Karnstedt should not be deemed prejudiced by the trial court's action in granting Bartlett's motion for judgment notwithstanding the verdict. As to the first ground, it, of course, has been a settled rule of this court that we will not decide issues which are raised for the first time on appeal. Why the defendant Karnstedt should have raised the question in the trial court prior to the issuance of the order is not apparent. Admittedly, he probably could have called the attention of the court to the claimed error on a petition for rehearing of the motion. However, we are unable to see the force of the argument. As to the second ground, there is considerable validity if we should see fit to overrule American Motorists Ins. Co. v. Vigen, 213 Minn. 120, 5 N. W. (2d) 397, 142 A. L. R. 722. Defendant Karnstedt contends that granting defendant Bartlett judgment notwithstanding the verdict was prejudicial to him because thereby was destroyed all basis (1) for judgment establishing a common liability between the defendants to plaintiff and (2) for a claim of contribution of defendant Karnstedt against defendant Bartlett. At the time the order was made, the Vigen case, *supra,* expressed the law of the state relative to contribution, and, under that decision, defendant Karnstedt was clearly prejudiced by the order. Defendant Bartlett argues that the Vigen case should be overruled, thus restoring to Karnstedt the right to such contribution; that with a right to contribution, he would not be prejudiced by the court's order; and that his appeal should therefore be dismissed. We have, however, determined not to consider the Vigen case further at this time and under these circumstances. Because of the oft-occurring questioning of the correctness of the Vigen case, undoubtedly it will. be given further consideration when the issue determined in that case comes squarely before the court. In view

of what has been said, defendant Bartlett's motion to dismiss, as to him, the appeal of defendant Karnstedt will be denied.

■ The correctness of the court's order in granting defendant Bartlett judgment notwithstanding the verdict is challenged by defendant Karnstedt. In a memorandum attached to the order granting judgment notwithstanding the verdict, the court said:

"The evidence as a whole overwhelmingly preponderates to show that defendant Karnstedt failed to stop his automobile before entering the arterial highway and that the accident was not due to negligence on the part of defendant Bartlett. The testimony of Bert Cole is incredible and unworthy of belief."

It is apparent that a serious question is being raised.

Bartlett, knowing he was on an arterial or through street, until he saw otherwise, had a right to assume, as he testified he did, that the Karnstedt car would heed the stop sign and, not only stop, but also yield the right of way to his car which was approaching so closely on the through highway as to constitute an immediate hazard. Olson v. Anderson, 224 Minn. 216, 219, 28 N. W. (2d) 66, 68, where we said:

"* * * The driver upon a highway which he knows to be protected by stop signs may assume, until he sees otherwise, that drivers approaching an intersection so protected will heed the stop sign and not only stop, but look for and yield the right of way to other vehicles which are approaching so closely on the through highway as to constitute an immediate hazard. M. S. A. 169.20, subd. 3. In short, he may assume ordinary care on the part of such drivers until he observes the contrary. * * * In the light of the present statute, which differs from previous ones requiring only a stop, we think that plaintiff's driver, knowing of the stop sign, might have reasonably assumed, notwithstanding he could not see to the east, that he was safe in approaching and driving through the intersection at even 45 or 50 miles an hour."

The prima facie speed limit was 60 miles per hour.

The prima facie speed limit on France avenue was 30 miles per hour. Bartlett, knowing the stop sign was there, might reasonably have assumed that he was safe in approaching through the intersection at that speed, until he observed that Karnstedt was not going to stop. The stop signs, at whatever distance they may be placed from the through highway, require the driver to stop *at the entrance* to such highway. That is the point at which Bartlett had a right to assume Karnstedt would stop. In Bohnen v. Gorr, 234 Minn. 71, 78, 47 N. W. (2d) 459, 464, we said:

"A stop sign is intended to warn motorists of the presence of a through or arterial highway. Our statute requires the driver of a vehicle approaching a through highway to stop *at the entrance* to such highway. Stop signs are usually erected some distance from the entrance to the through highway in order to afford approaching motorists an opportunity to stop before they reach the highway."

Bartlett stated that as he started into the intersection, at a point where a crosswalk would be located, he realized for the first time that Karnstedt was not going to stop, so he applied his brakes and turned to the left to avoid the collision. The collision took place in the southwest quarter of the intersection, just west of the center of France avenue. The only testimony in the case which would warrant the court in submitting the question of the negligence of Bartlett to the jury was that given by Cole, who testified that, when the Bartlett car was back in the block 150 to 175 feet and the Karnstedt car was in a stopped position at the stop sign, the Bartlett car was traveling 40 miles per hour. He said he watched it for 50 or 75 feet and that he did not see it again until just before the impact when it was a foot or two from the Karnstedt car. Bartlett is corroborated as to speed by two of his passengers, Grace Bartlett, his wife, and Blanche Lenont. The question then is whether, in view of all the evidence in the case and the physical facts, the testimony of Cole that Bartlett was traveling at an unlawful rate of speed is sufficient to support a verdict against Bartlett. There is no testi-

mony from Cole as to speed except that, when Bartlett was in the block to the north about 150 to 175 feet, he was traveling at 40 miles per hour. There is no testimony given by him as to Bartlett's speed from there until the collision took place—that is from 150 to 175 feet in the block to the east until the cars came together, which would be a total distance of over 175 to over 200 feet. The testimony of all other witnesses who testified as to Bartlett's speed is that, while he was covering that distance, he was traveling at a lawful and reasonable speed. There is no evidence that at the time he was entering the intersection he was exceeding the permissible speed of 30 miles per hour. The right front of Bartlett's car struck the left front side of Karnstedt's car, which kept on going for a distance of 62 feet, angling to the right, and came to rest in the southeast quadrant of the intersection if extended. If the Bartlett car had been traveling as fast as claimed by Karnstedt, and had struck the left front side of the Karnstedt car as it did, it does not seem possible that the Karnstedt car could have taken the course it took. The testimony of Cole as to speed is too slender a thread on which to hang a verdict.

■ Defendant Karnstedt claims the verdict is excessive and assigns that as error.

Plaintiff was 41 at the time of the trial, was a registered nurse, and lived at Virginia, Minnesota. In 1936, she became employed at the municipal hospital at Virginia at a wage of $55 per month and maintenance. As time went on her responsibilities and pay increased. At the time of the accident she was superintendent of nurses and earned $310 per month without maintenance. She was able to perform her duties without any difficulty. She had 20 nurses and 20 other subsidiary workers under her supervision. As superintendent of nurses, she had no regular hours of employment but was usually on duty nine to twelve hours a day. All supplies and all drugs, except prescriptions, were issued by her. She admitted all patients and took orders from the doctors. She helped out in the operating and receiving rooms and administered anesthetics when necessary. She also did transfusion work. Because of short-

age of help, she was forced to do a great deal of work ordinarily done by the nurses. She was a healthy, strong, average individual and had experienced no serious illness, accident, or operation.

The plaintiff has no recollection of the accident and no recollection of events at the hospital for the first three days. For about six days she had practically no memory of events at all. The first she noticed was her right arm in traction, her chest bandaged and taped, and the complete paralysis of her left arm. There was an abrasion or two on her face and ankles. The right hip and the two shins were discolored. The eyes would not dilate. There was a rolling feeling when moving the head from side to side, and she experienced a sensation of falling. Because of the sensitive condition of her eyes, the room was kept darkened. Considerable pain was present at all times. During her hospital stay she had five special nurses. The right arm was in traction 14 days and then in a splint for eight days. Commencing about February 22, her left arm was massaged five times daily. She had massage, hot packs, and exercise for both arms. In about May or June, she could pick up pieces of paper with the left hand. While in the hospital she had headaches, spells of dizziness, and was very moody. She did not want anybody around. She had periods of depression and cried a great deal. While at the hospital she also had pain in the chest and shortness of breath.

The plaintiff went home on March 11. She remained in bed for three days and then commenced going to the clinic for massage, heat, and exercise. This continued through December 1950. She visited the clinic 77 times. During this time the paralysis in her left arm improved very slowly. There was progress until about July; since then there has been very little improvement. She went back to the hospital to work on September 18, 1950. Since that time she has worked five days a week, five hours a day. Before the accident her rate of pay was $310 per month. On September 18, the rate of pay for superintendent of nurses was $325 per month without maintenance, but, because of her inability to work full time,

she received usually $206.80 per month. The total amount of her earned income in 1950 was $1,496.83.

Dr. Donald Charles MacKinnon was her first attending physician. He was called to the hospital soon after plaintiff arrived there. He found her unconscious and in a critical condition. He described her condition at that time as follows: Severe chest injury and evidence of edema; froth emitting from her mouth; cyanotic; gasping respirations; extremely restless so that she had to be restrained in bed. Shortly thereafter she developed a traumatic shock and her blood pressure dropped from 120 systolic over 80 diastolic, on admission, to 80 over 0. The pulse rose to 140. Treatment was instituted immediately for the two serious situations: The edema, or water accumulation in the lungs, and the shock. Oxygen and two blood transfusions were given. Emergency measures to save her life were inaugurated. The very critical condition continued until nine or ten o'clock the next morning. Dr. MacKinnon stated that she was found to have the following injuries: Cerebral concussion, which caused loss of memory; injury to the chest, which produced pulmonary edema; acute traumatic shock; dislocation of the acromioclavicular joint, a joint where the outer end of the clavicle joins the acromion, the bony process on the shoulder blade, the dislocation of which causes the shoulder to drop; dislocation of the sternoclavicular joint, a fixed joint which holds the clavicle or collar bone to the breast bone; fracture of the upper end of the right humerus, near the surgical neck; fracture of the transverse process of the seventh cervical vertebra; a compound fracture of the zygomatic arch, the cheek bone, which has an arch projecting backward, which arch is the bone behind the main prominence of the cheek bone; serious injury to the left brachial plexus, with resulting paralysis and weakness to left upper arm, the brachial plexus being a group or bundle of nerves which comes together beneath the clavicle, and which enervate the muscles; laceration of cheek, left little finger, and ring finger; large contusion of the right hip with multiple contusions of the lower extremities and face; and fractures of the anterior portions of the left first, second, and third ribs, which

ribs are high in the chest underneath the clavicle. The cerebral concussion was moderately severe, indicating brain injury. She suffered from amnesia. After regaining consciousness, she was a little confused for a few days and drowsy. In the hospital she complained of dizziness very frequently when she turned her head in any direction, particularly to the left, and occasionally complained of headache. Headaches and dizzy spells are common symptoms following a brain injury of that kind. The right arm was placed in traction. To accomplish this, a pin was put through the elbow. An operation was performed to fix the dislocation of the clavicle and the acromion process. She was in the operating room twice. The traction was removed after 17 days, and the arm was placed in a Velpeau dressing, a sort of a bandage to support the arm in a sling. After a week this was removed, and physiotherapy was started. Sensation in the left arm began to come back after three or four days. It was a gradual return of sensation for a considerable length of time. The return of function to the muscles of the left arm, and left forearm and hand was also gradual. While in the hospital she had physiotherapy to both upper extremities.

So far we have described plaintiff's injuries and the progress she had made toward recovery. Next we will consider her condition at the time of the trial, April 9, 1951. The left shoulder was extremely painful when she tried to raise it beyond the level. She demonstrated to the jury the limit of motion. It could not be raised beyond that point, which prohibits her from reaching up to a shelf. The little finger on her left hand, the ring finger, and half of the middle finger, extending up to the elbow, are supersensitive. At the elbow there is a very sensitive spot. She has a feeling which makes her draw her hand into a fist rather than keeping it out straight. In her work she has to count items such as pills and tablets, and when she holds them for any length of time she gets a cramp in her hand that causes them to drop. She cannot take hold of a gallon jug and hold it, because the weight is too much. The little finger on the left hand and the one next to it are smaller. Both quiver. Her two hands were exhibited to the jury. A broken wire in the

right shoulder bothers her when she reaches in a certain direction and it causes pain at times. The weight of clothes irritates. There is also some limitation in the right shoulder. She is subject to more headaches than at the hospital and finds that she gets extremely nervous and upset over little things, which she did not do previously. She often gets so dizzy that she has to sit down. For that reason she spends a great deal of time in the office. She is not able to work any longer than five hours a day for five days a week. At the end of five hours she is extremely tired. Every day she takes aspirin in various amounts for headache. She has been given a full-time assistant. Since her return to work she has not done the same type of work as before. She is not able to give anesthetics; is not able to give blood transfusions, because she cannot use her left hand to hold the siphon; is not able to go to surgery or the receiving room; is not able to uncrate supplies; and cannot reach up to get anything that is high, because she is short and cannot hold with her left hand.

She can do no physical work in the way of lifting or moving patients and has done nothing of that kind since she returned to the hospital. She is doing a great deal less than before—about half or probably better than half. She is unable to do floor work. At the time of the trial, she had pain in the sternum, and it radiates to the left on the least exertion. There is also shortness of breath when overtired. She is moody, depressed, and cries easily. She is inclined to snap at people.

Dr. MacKinnon testified that, at the time of trial, plaintiff had a restricted motion of the right shoulder in flexion and abduction, and some restriction in extension and rotation and that the disability and limitation of motion in the right shoulder region was about 25 percent because of the limitation of the various types of motion. Loss of motion in the left shoulder of various degrees in flexion, extension, and abduction, amounted to approximately 30 percent. (Dr. Edward N. Peterson said there was a permanent partial loss of the use of the left arm, including the shoulder of about 40 percent.) There was normal motion in the left elbow,

wrist, and fingers, but a loss of power and strength in those parts, with a diminished grip of her hand. There is a 10-percent loss of strength in the left forearm and the left hand, according to Dr. MacKinnon. (Dr. Peterson said there was a loss of strength in her left hand of approximately 40 percent.) This 30-percent loss of motion in the left shoulder is attributable to the damage and injury to the brachial plexus. She has an area of hypersensitivity extending from below the elbow down to the inner portion of the arm, and the inner portion of the hand, the ring finger, and part of the middle finger. This follows a definite nerve pattern. There is some muscle atrophy in the inner aspect of the upper forearm muscles. There are also subjective symptoms. She complained of tightness in the palm of her hand and a tendency to draw or flex the little and ring fingers into the palm. She could straighten out her little finger, but there was a tendency to contraction. She complained of cramps in the hand, dizziness, intermittent headaches, pain, and discomfort in the region of the fractured ribs. She complained of pain when she rotated her head extremely to the left. That is probably due to the fracture of the transverse process on the right. In the opinion of Dr. MacKinnon, such complaints are justified by the objective symptoms and can be expected to follow injuries of the character which she sustained. In view of the injuries she sustained, very good results followed. Up to a certain point, injuries such as she received continue to improve.

Dr. Peterson, a member of the staff of the Virginia municipal hospital and in 1950 the chief of staff, testified that plaintiff does not have the capacity for a full eight-hour day; that she complains of being tired; and that she has not the ability to continue to carry out the responsibilities that go with the position of superintendent of nurses. In the Virginia hospital the superintendent takes care of the drugs and helps get out the supplies for the floor from the drug room and supply room. They depend on her at times to help out in the operating room for emergencies and do floor work when short of help. Dr. Peterson said that at the time of the accident plaintiff was a normal and stable person in emotion and was good na-

tured and cheerful. The accident resulted in personality changes. She lacks capacity, has periods of depression, and the problems which hospitals have give her considerable more concern than they had in the past. Differences of opinion among the help and arguments which come up seem to concern her a little more. Normally the superintendent of nurses works whenever there is work to be done and plaintiff is not able to do more than 65 or 70 percent of her work. Dr. Peterson said that one cannot have as many fractures and dislocations as plaintiff had without injury to the adjacent soft parts, such as ligaments, muscles, nerves, and blood vessels.

The medical testimony is to the effect that plaintiff's disability in the right shoulder and left shoulder and extremity is permanent. The compound fracture of the zygomatic arch healed in a depressed condition, which is apparent on inspection. The injuries have permanently impaired her ability to do work involving lifting, pushing, pulling, bending, or any work of that type. Her ability to perform the duties of the position of superintendent of nurses has been permanently impaired. She would not be employable as a nurse, except to take care of people who are not very sick. For ordinary floor nursing, she would have difficulty in sustaining the eight-hour shift and in the care of ordinary patients.

The total special damages for nurses, hospital, and medical fees amounted to $3,187.82. Plaintiff's loss of earnings to the date of the trial was $3,010.40. Since the verdict was $48,861.75, $42,663.53 must be allocated to the injuries which she received, the pain and suffering which she has endured and which she will endure in the future, the permanent incapacity she will experience, and the loss of future earnings. Since the verdict is large and the protestations against its size are vigorous and made in all sincerity, we have gone into a great deal more detail in describing the injuries than we ordinarily do. How large a verdict would reasonably compensate plaintiff for the injuries she received, the pain and suffering which she has endured, and which she in all probability will endure in the future, and the permanent incapacity and discomfort which she will have to contend with through life, of course, cannot be deter-

mined with any exactitude. The injuries in the instant case are more numerous and serious than we find in most cases, and the permanent aftereffects very substantial. They alone would support a large verdict. Then the loss of earning power in the future will be very substantial. If her existing condition is permanent, as the medical testimony indicates it will be, it is fair to assume that she will not be able to earn any more in the future than she is able to at present. Considering the picture as a whole, we are of the opinion that the verdict of the jury should not be disturbed.

■ Defendant Karnstedt charges misconduct on the part of plaintiff's counsel in his closing argument to the jury. The court denied him a new trial on that ground, and he assigns its action as error. During the argument, while discussing plaintiff's injuries, the counsel said:

"Now, * * * the testimony here is entirely without dispute as to her permanent disability. There isn't even a shadow of an argument about it. It is conceded and admitted here that she has and will continue to have a loss of use of the right arm of 20 per cent or 25 per cent. One doctor put it 25 and the other put it 20. She will have a loss of use of her left arm or the entire extremity of 40 per cent. It is admitted here that, as a private nurse, she would be able to perform about 50 per cent of her duties which means, as a superintendent of nurses, she is able to perform about two-thirds of her duties."

Counsel for defendant Karnstedt excepted to the remarks and asked the court to charge the jury that the defendant Karnstedt does not admit these things and that the burden of proving them is upon the plaintiff and not upon defendant Karnstedt. He stated that he wished the record to show that defendant Karnstedt will not be satisfied with the general charge itself, and that the statements were so wrong, so improperly stated, that nothing could possibly correct them, except a direct charge by the court and a direct admonition to the jury to disregard them. The court took no action. Counsel said:

"* * * It is admitted here that, as a private nurse, she would be able to perform about 50 per cent of her duties which means, as a superintendent of nurses, she is able to perform about two-thirds of her duties."

As we understand that language, the admission referred to was on the part of the plaintiff and not of the defendants. However, where counsel said:

"* * * It is conceded and admitted here that she has and will continue to have a loss of use of the right arm of 20 per cent or 25 per cent * * *"

and stated percentages that follow, the admission referred to was on the part of defendants. There can be no question but that the statement should not have been made and that the court, when it was called to his attention, should have taken care of it in the manner suggested. However, we have concluded, that a new trial is not called for, and we will set out the reasons for such conclusion. The plaintiff was very seriously injured as our statement of facts indicates. She was not cross-examined as to her injuries. The doctors produced by plaintiff testified to the percentage facts referred to in the argument. There was very little cross-examination, and no material shaking of that testimony. The defendant called no medical experts. It is fair to assume that what counsel had in mind was that no medical testimony was produced to show smaller percentages. The medical testimony supplied by plaintiff's witness was not questioned or attacked. However, it does not follow, that because of that fact, defendants admit the correctness of it.

The court gave to the jury the general instructions as to how they should determine what the testimony was and the credibility of the witnesses. It told the jury that it was for them to determine to what extent her earning capacity had been impaired, and it called attention to certain factors which they should take into consideration. As to permanent injuries, it said:

"* * * the matter of permanent injuries must be established with reasonable certainty."

With defendant's exception apparently in mind, it said:

"There is also a conflict with respect to the extent of the injuries. Miss Bocchi has testified with respect to her injuries, and her two doctors have testified, Dr. MacKinnon and Dr. Peterson. There has been no conflicting medical testimony. However, that does not mean that the defendants do not challenge the extent of the injuries. That is always a question for the jury to consider, and the pleadings that put that in issue."

This action was fairly and ably tried by counsel for all parties. There was no attempt by counsel for plaintiff to inject sympathy for his client or prejudice against the defendants. Not many cases come to us with a record as clean as this one. We get the impression that the few words claimed to be prejudicial were inadvertently made. In view of all the evidence in the case, medical and lay, the manner in which it was presented, the failure to produce evidence to contradict or weaken the testimony of plaintiff's medical experts, and the features of the court's charge which we have referred to, we are unable to see any substantial prejudice to defendant Karnstedt as a result of the claimed prejudicial remarks.

Orders and judgment affirmed.

MR. CHIEF JUSTICE LORING (concurring specially).

I agree with the result. I disagree with the invitation to the bar to seek a reconsideration of the Vigen case. It is wholly uncalled for by any issue presented in this case. The Vigen case follows the common law, and this court is part of the judicial branch of the state government not of the legislative branch.

MR. JUSTICE CHRISTIANSON took no part in the consideration or decision of this case.